FAUCHE et al. v. SCHELL.

*(Circuit Court, S. D. New York. October 24, 1887.)*

1. CUSTOMS DUTIES—ACTION TO RECOVER BACK—PROSPECTIVE PROTEST.
    A valid prospective protest against the payment of duties, made on a particular importation of merchandise, and expressing the intention of the importer that the protest shall apply to all future similar importations made by him, is, under the act of February 26, 1845, (5 U. S. St. at Large, 727,) valid as to subsequent importations of similar merchandise on which like duties are exacted by the same collector.

2. SAME.
    Such prospective protest is not invalidated as to any of such future similar importations under the act of February 26, 1845, by the same importer's in-

tervening specific protests as to other similar importations, if such specific protests are the same in form with the body of such prospective protest, and differ from it only in the omission of the prospective clause therein.

3. SAME.

A protest, consisting of two originally distinct pieces of paper,—one a white paper containing an unsigned printed form of one of such specific protests, the other a blue paper pasted to the white paper, and containing a signed printed form of a prospective protest against the exaction of duties on certain commissions,—is a valid protest under the rules applied by the courts to the construction of protests against the exaction of duties. The prospective clause of the commissions protest covers everything in such composite protest from the beginning to the end so far as its form is concerned, and such composite protest is as far-reaching as any prospective protest.

4. SAME—ACTION TO RECOVER BACK—SUFFICIENCY OF PROTEST.

A protest made in the case of merchandise not enumerated *eo nomine* in the tariff act in force at the time of its importation, and stating only that the same is claimed to be dutiable at a rate of duty which is imposed upon upwards of 50 articles especially enumerated therein, is insufficient under the protest act of February 26, 1845, and no recovery can be had thereunder.

5. SAME—ACTION TO RECOVER BACK—PROTEST—SERVICE UPON COLLECTOR.

Where no provision for the mode of service upon a collector of customs of a protest against the exaction of duties is made by statute, by treasury regulations, or by such collector, but a particular mode of service thereof has been in force and recognized by the treasury department for a considerable time prior to the appointment of such collector, service thereof in that mode is a good and sufficient service until some change of that mode promulgated by the authority of such collector has been announced.

6. SAME.

When the evidence as to the usual course of business at the custom-house produced by an importer in action brought by him against a collector of customs for excessive duties exacted of him by such collector is sufficient to furnish a strong presumptive case in favor of the service upon such collector, or other person authorized to receive the same, of a protest against such exaction, the proof from the records of protests kept at the custom-house during his term of office as such collector that such protest was recorded when received, and that it stands of record as of a certain date, is abundant to establish the fact that it was served upon such collector, or other authorized person, and that it was served in time.

7. SAME—ACTION TO RECOVER BACK—TREASURY REGULATIONS.

While articles 384, 386, and 387, as to protest under the revenue laws issued by the treasury department February 1, 1857, for the guidance of collectors, or other officers of the customs, and their subordinates, might during the time they were in force have, of course, controlled them, they could not have controlled an importer as to the manner in which he should have prepared his protests.

8. SAME—ACTION TO RECOVER BACK—PAYMENT TO OBTAIN POSSESSION.

Where an importer, before the delivery to him of his importation of goods, wares, and merchandise, or any part thereof, paid in cash as prescribed by section 12 of the act of August 30, 1842, (5 U. S. St. at Large, 561,) the full amount of duties required thereon by law, and delivered to the collector the 10-day bond prescribed by section 4 of the act of May 28, 1830, (4 U. S. St. at Large, 410,) or where, having in accordance with the same acts so paid the amount of the estimated duties on his importation, and so delivered such bond, he received a portion of such importation, and subsequently and before he received the other portion thereof paid a sufficiently additional amount of duties to make up the full legal amount of duties assessable on the entire importation, such payment or payments was a payment of duties to obtain possession of the entire importation within the terms of the act of February 26, 1845.

At Law. Action to recover back customs duties.

The plaintiff's firm of Lachaise, Fauche & Co. in 1857 and the two succeeding years made 62 importations from France into the port of New

York of certain *mousseline de laines,* composed wholly of worsted or worsted with a satin stripe. Collector Schell classified these importations, and exacted duty thereon at the rate of 24 per centum *ad valorem,* under the provision for "de laines" contained in Schedule C of the act of July 30, 1846, (9 U. S. St. at Large, 42,) as amended by the act of March 3, 1857, (11 U. S. St. at Large, 192.) The plaintiffs' firm claimed that these importations were dutiable at the rate of 19 per centum *ad valorem* under the provision for "manufactures of worsted," etc., which (together with the provisions for the same rate of duty on more than 50 other articles) is contained in Schedule D of said act as amended; and brought this suit to recover the duties exacted in excess of 19 per centum *ad valorem.* Upon the trial, it appeared that "mousseline de laines" like plaintiffs' firm were in 1857 and the two succeeding years dutiable at 19 per centum *ad valorem* as "manufactures of worsted," etc., under the provision therefor contained in said Schedule D, and that in those years the following laws and treasury regulations were in force:

Section 1 of the act of March 3, 1851, (9 U. S. St. at Large, 629), which provided that—

"In all cases where there is or shall be imposed any *ad valorem* rate of duty on any goods, wares, or merchandise imported into the United States, it shall be the duty of the collector, within whose district the same shall be imported or entered, to cause the actual market value or wholesale price thereof at the period of the exportation to the United States in the principal markets of the country from which the same shall have been imported into the United States to be appraised, estimated, and ascertained, and to such value or price shall be added all costs and charges, except insurance, and including in every case a charge for commissions at the usual rates, as the true value at the port where the same may be entered upon which duties shall be assessed."

Section 21 of the act of August 30, 1842, (5 U. S. St. at Large, 565,) which provided—

"That the collector shall designate on the invoice at least one package of every invoice, and one package at least of every ten packages of goods, wares, or merchandise, and a greater number, should he or either of the appraisers deem it necessary, imported into said port to be opened, examined, and appraised, and shall order the package or packages so designated to the public stores for examination."

Section 4 of the act of May 28, 1830, (4 U. S. St. at Large, 410,) which provided that—

"No goods liable to be inspected or appraised as aforesaid shall be delivered from the custody of the officers of the customs until the same shall have been inspected or appraised, or until the packages sent to be inspected or appraised shall be found correctly and fairly invoiced and put up, and so reported to the collector: provided, that the collector may, at the request of the owner, importer, consignee, or agent, take bonds with approved security in double the estimated value of such goods, conditioned that they shall be delivered to the order of the collector at any time within ten days after the package or packages sent to the public stores shall have been appraised and reported to the collector; and if in the mean time any of the said packages shall be opened without the consent of the collector or surveyor given in writing, and then in the presence of one of the inspectors of the customs, or if the said package

or packages shall not be delivered to the order of the collector, according to the condition of the said bond, the bond shall in either case be forfeited."

Article 229 of treasury regulations, issued February 1, 1857, which prescribed a form of bond conforming in its terms to the requirements with last-mentioned act, (1830.) Section 12 of the act of August 30, 1842, (5 U. S. St. at Large, 561,) which provided that "on and after the day this act goes into operation, the duties on all imported goods, wares, or merchandise shall be paid in cash." Section 1 of the act of February 26, 1845, (5 U. S. St. at Large, 727,) provided that—

"Nothing contained in the second section of the act entitled 'An act making appropriations for the civil and diplomatic expenses of government for the year 1839,' approved on the third day of March, 1839, shall take away, or be construed to take away or impair, the right of any person or persons who have paid or shall hereafter pay money, as and for duties, under protest, to any collector of the customs, or other person acting as such, in order to obtain goods, wares, or merchandise, imported by him or them, or on his or their account, which duties are not authorized or payable in part or in whole by law, to maintain in any action at law against such collector or other person acting as such, to ascertain and try the legality and validity of such demand and payment of duties, and to have a right to a trial by jury, touching the same according to the due course of law; nor shall anything contained in the second section of the act aforesaid be construed to authorize the secretary of the treasury to refund any duties paid under protest; nor shall any action be maintained against any collector to recover the amount of duties so paid under protest, unless the said protest was made in writing, and signed by the claimant at or before the payment of said duties, setting forth distinctly and specifically the grounds of objection to the payment thereof."

Articles 384, 386, and 387 of said treasury regulations, which provided that—

"General protests against the exaction of duties are not admissible; the law requiring a protest to be made to the collector of the customs in writing subscribed by the importer or his duly authorized agent at or before payment of the duties, setting forth distinctly and specifically his objections to the payment of the duties demanded. A general protest, it has been decided by the department in conformity with judicial decisions made on any one importation, cannot be taken as extending and applying to future importations of a similar character. Protests are not to be written on the entry, but on a separate paper to be marked with the number of the entry to which it belongs, and kept in a proper file arranged for that purpose;" and that "whenever duties are put under a protest, collectors of the customs will have the protest carefully and accurately copied at length in a record to be kept for that purpose, properly compared, verified, and certified as a correct copy by the officer or officers making such comparison; the number and date of entry, name of importer, vessel, and description of merchandise in regard to which the protest is made, to be duly stated on the record for the purpose of identification. This precaution is deemed necessary as well for the protection of the importer as the United States, in the event of the loss of the original protest by accident or otherwise."

Plaintiffs produced from the custom-house where they were made, the entries made by their firm of the importations in suit, together with various protests. Of these protests four were written on the entries to which they applied, others were attached by wafer to such entries; and

still others were separate and detached therefrom and indorsed with the date of their receipt or filing. In the usual course of business at the custom-house at the time of the importations in suit it was customary for an importer or his broker to write on the entry, or attach thereto by wafer or otherwise, or keep separate and detached therefrom, such protest as he desired to make against the exaction of duties, and before the payment of such duties to present to the custom-house where the same were received without objection and filed away, the entry with the protest written thereon or attached thereto, or the entry and the protest separate and detached therefrom. During this time certain books called "Protest Books" were kept at the custom-house, in which protests so filed and received were recorded, or supposed to be recorded. Protests Nos. 1 and 2 were written upon the entries to which they respectively applied, but were not recorded in the protest books. They were in the following form:

"NEW YORK, July * * * 1857.

"*Augustus Schell, Esq., Collector of the Port of New York*—SIR: We hereby protest against the payment of a duty of twenty-four per cent. charged by you on worsted stuff goods, claiming that under existing laws said goods are only liable to a duty of nineteen per cent. as a manufacture of worsted. We pay the amount exacted by you to obtain possession of the goods, claiming to have the difference refunded. LACHAISE, FAUCHE & CO."

Protest No. 3 was attached by wafer to its entry, and protest No. 4 written on its entry; but neither was recorded. Their form was as follows:

"NEW YORK, July 27, 1857.

"*Augustus Schell, Esq.*—SIR: We hereby protest against the payment of a duty of 24 % charged by you on worsted stuff goods, claiming that under existing laws said goods are only liable to a duty of 19 %. We pay the amount exacted to obtain possession of the goods, claiming to have the difference of duty refunded to us.

"Yours respectfully, LACHAISE, FAUCHE & CO."

Protest No. 5 was a printed protest attached by wafer to its entry, and recorded. Its form was as follows:

"NEW YORK, Jany. 30th, 1858.

"*Augustus Schell, Esq., Collector of Customs*—SIR: We object to the classification of our *mousseline de laines,* or worsted *mousselines* embraced in our entry * * * marked * * * No. * * * under schedule C, thereby subjecting them to a duty of 24 per centum *ad valorem,* while we claim they are liable to 19 per centum only, and for the following reasons, viz.: Because the article of worsted *mousseline* or *mousseline de laine,* being a manufacture composed wholly of worsted, is subject only to the duty imposed on worsted fabrics, viz., 19 per centum; that it has no connection with the article denominated and known among merchants and dealers in the article as 'De Laines,' which is specified under Schedule C, and which is composed of a cotton warp and worsted weft; that the article of *mousseline de laine,* or worsted *mousseline,* was known among merchants and dealers in the article at and long before the passage of the tariff act of March 3, 1857, by that name as a manufacture of worsted, and as an article totally and entirely distinct from the fabric manufactured of worsted and cotton known among merchants and dealers in the article exclusively by the title or name of 'De Laines;' that the

article known as '*Mousseline de Laine*' is not manufactured in this country, while the article known as '*De Laine*' is extensively produced here; and it could not have been the intention of congress to impose a cotton duty upon an article manufactured wholly of worsted, and which did not come in competition with an American product. For these reasons, we contend that we are entitled to enter and pay duty on the above described goods at the rate of duty on manufactures of worsted, and protest against the payment of a higher rate of duty.          Yours, &c.,                    LACHAISE, FAUCHE & Co."

Protest No. 6 was attached by wafer to its entry, and recorded. It consisted of two pieces of paper—one a white paper containing an unsigned printed form of protest, dated February 10, 1858, like protest No. 5; and the other, a blue paper pasted to the white paper, and containing a signed printed form of a commissions protest, which concluded with the following prospective clause: "*You are hereby notified that we desire and intend this protest to apply to all future similar importations made by us.*" There were two other protests like No. 6, attached by wafer to their entries subsequently made but not recorded and in suit. Protests like these three, the evidence showed, importers and their custom-house brokers were accustomed in the years mentioned to make for their convenience and to save time.

After the making of the importations to which the foregoing protests applied, plaintiffs' firm made other similar importations, as to some of which they made special protest like No. 5, and as to others of which they made no protests, but relied upon protest No. 6. Many of the latter importations followed specially protested ones. According to the usual course of business at the custom-house during the years in which the importations in suit were made, an importer, to obtain possession of a portion of his importation before the time first prescribed by section 4 of the act of 1830, was obliged to give the 10-day bond required by that section, and pay to the collector the estimated duties on such importation; and that he then obtained possession of all his importation with the exception of such packages as were designated by the collector pursuant to section 21 of the act of 1842 for examination by the appraiser. In case of most of the importations in suit at the close of the trial, the amount of the estimated duties so paid was at the rate of 24 per centum *ad valorem*; but in case of the others, the amount of estimated duties so paid was at the rate of 19 per centum *ad valorem* on each importation thereof; but before the plaintiffs' firm received the packages thereof designated for examination, they were obliged to pay an additional duty of 5 per cent. on all of such importation.

Both sides having rested, the defendant's counsel moved the court to direct the jury to find a verdict for the defendants: *First.* As to every importation in suit on the ground (1) that the duties sought to be recovered were not paid to obtain possession thereof as required by the act of February 26, 1845; and (2) that it was not shown that any of the protests, upon which plaintiffs relied to recover such duties, was ever served upon the collector, and if so served, was ever so served at or before the payment thereof as required by the same act. *Second.* As to the importations to which protests Nos. 1, 2, 3, and 4, respectively applied, on the

grounds (1) that neither of said protests set forth distinctly and specifically the ground of objection to the payment thereon of the duty sought to be recovered, as required by the same act; and (2) that neither was recorded in the protest books of the custom-house.    *Third.* As to each of the three importations to which protest No. 6 and the other two like protests respectively applied, on the ground that the *mousseline de laine* protest part of such protest was unsigned, and the signature to the distinct charges and commissions protest part thereof was not the signature to such *mousseline de laine* protest part as was required by the same act. *Fourth.* As to certain of the importations which were without protests of their own, on the ground (1) that plaintiffs' firm had made no protest as to any of such importations, as required by the same act; and (2) that if the concluding prospective clause of protest No. 6, or of either of the other two like protests, be held to be a part of the *mousseline de laine* part thereof, neither protest No. 6, nor either of the other two like protests, was such a protest as to any of said importations as was required by the same act.    *Fifth.* As to others of the importations, which were without protests of their own, on the same grounds as just stated; and on the further ground that, as there intervened between protests No. 6, or either of the other two like protests and such unprotected importations, various importations with protests like No. 5, special or without prospective clause, the prospective clause of No. 6, and of each of the other two like protests, was as to such unprotected importations nullified by such intervening protest, under the principle laid down in *Baxter* v. *Maxwell,* 4 Blatchf. 32.

*Almon W. Griswold,* and *Almon W. Griswold, Jr.,* for plaintiffs, cited—

Section 21, Act Aug. 30, 1842, (5 U. S. St. at Large, 565;) section 4, Act May 28, 1830, (4 U. S. St. 410;) section 12, Act Aug. 30, 1842, (5 U. S. St. 561;) *Greely's Adm'rs* v. *Burgess,* 18 How. 413; *Vaccari* v. *Maxwell,* 3 Blatchf. 369, 374; *Arthur* v. *Morgan,* 112 U. S. 495, 5 Sup. Ct. Rep. 241; *Frazee* v. *Moffitt,* 20 Blatchf. 267, 18 Fed. Rep. 584; *Swanston* v. *Morton,* 1 Curt. 294; *Kriesler* v. *Morton,* Id. 413; *Burgess* v. *Converse,* 2 Curt. 216; *Schuchardt* v. *Lawrence,* 3 Blatchf. 397; *Brune* v. *Marriott,* Taney, 132, 9 How. 619; *Steegman* v. *Maxwell,* 3 Blatchf. 365; *Hutton* v. *Schell,* 6 Blatchf. 48; *Wetter* v. *Schell,* 11 Blatchf. 193; *Ullman* v. *Murphy,* Id. 354; *Herman* v. *Schell,* 18 Fed. Rep. 891.

*Stephen A. Walker,* U. S. Atty., and *Henry C. Platt* and *Thomas Greenwood,* Asst. U. S. Attys., for defendants, cited—

*Bartels* v. *Schell,* 16 Fed. Rep. 341: Act Feb. 26, 1845, (5 U. S. St. 727;) *Moke* v. *Barney,* 5 Blatchf. 274; *Watson* v. *Barney,* 92 U. S. 449; *U. S.* v. *Schlesinger,* 120 U. S. 109, 7 Sup. Ct. Rep. 442; *Arnson* v. *Murphy,* 115 U. S. 579, 6 Sup. Ct. Rep. 185; *Charron* v. *Redfield,* INGERSOLL, J., November, 1857, unreported; *Thompson* v. *Maxwell,* 2 Blatchf. 392; *Focke* v. *Lawrence,* Id. 508; *Sadler* v. *Maxwell,* 3 Blatchf. 134; *Stalker* v. *Maxwell,* Id. 138; *Crowley* v. *Maxwell,* Id. 404; *Swanston* v. *Morton,* 1 Curt. 294; *Kriesler* v. *Morton,* Id. 413, 417; *Curtis' Adm'r* v. *Fielder,* 2 Black, 461; *Davies* v. *Arthur,* 96 U. S. 148; Articles 384, 386, 387, Treasury Regulations 1857; *Warren* v. *Peaslee,* 2 Curt. 231; *Baxter* v. *Maxwell,* 4 Blatchf. 32.

LACOMBE, J., (*orally.*) The question of prospective protests is common to many of these entries. If this were a question simply of a consideration of the decision in *Brune* v. *Marriott*, 9 How. 619, and of the act of 1845, I should have very little difficulty in dealing with it. The decision in the *Marriott Case* is very carefully guarded by the court. It is restricted to the facts before it. The court expressly says in the opinion that the amount is very small; that there was a common understanding between the collector and the importer that these protests were good generally; and that the money paid for duty had not been covered into the treasury. I should not consider that decision as sufficiently authoritative to require the ingrafting upon the act of 1845 of the doctrine of prospective protests. I do not see that that act contemplated any such method of protest. But it is undoubtedly the fact that, by a gradual process of accretion which has gone on for many years, each decision going further than the one before it, the weight of authority in this circuit is, undoubtedly, in favor of a liberal construction of these protests; and that, of course, is controlling upon us here. The only qualification in this circuit to which my attention has been called is the case of *Baxter* v. *Maxwell*, 4 Blatchf. 32. In that case, as I understand it, subsequent to the service of the prospective protest, there were served, as to different importations, specific protests, stating other and different grounds from those named in the prospective protests, and not reiterating the grounds therein stated. The court held that in such cases the importer was to be restricted to the specific ground which his protest alleged with regard to that importation; and that the fact that he had failed to reiterate the old ground, and stood, as to that importation, upon the new grounds, would be sufficient to warrant the collector in assuming that from and after the service of this *amended* protest, as we might call it, that is, the new statement of his grounds, he intended to rely only upon the grounds then given. The facts in this case are not parallel with that cited; because, from the beginning of these protests to the end of them (certainly from protest No. 6, the first prospective protest, down to the close) the importers always served, with each of these protests this same mousseline delaine protest. Sometimes it is accompanied with other protests, and with the prospective clause, and sometimes it is not; but he never makes any protest at all without reiterating the mousseline delaine protest. He has not, therefore, as to that, shifted his ground, as the importer did in the *Baxter Case;* and, therefore, in my judgment, is not within the rule there laid down. I feel constrained, therefore, by the decisions in this circuit, to rule that the prospective protests are good as covering subsequent importations.

There is here no general prospective protest. There are a number of specific protests with a general clause attached to them. In order to obtain any vitality at all they must, of course, have been properly served as specific protests; otherwise they would have no force at all, and would not operate as prospective protests. For instance, if the money was paid on January 2d, and on January 4th a protest was made as against that importation, that protest would not be good as to that im-

portation, nor would I be inclined to extend the doctrine of prospective protests so as to hold its prospective clause good as to any other importation. But if a prospective protest, with a general clause at the end, is properly served, and is in proper form, and may be regarded as a specific protest, the clause would then become operative as a general protest, prospective in its effect, and covering future importations. With that understanding we may proceed to an examination of these various items.

It is true that the importer has to do three things: he has to show that the rate of duty was excessive; that the duties were paid in order to obtain possession of the goods; and that a protest, in writing, signed by him, distinctly and specifically setting forth the grounds of his objection, was served at or before the payment of the duties. Concededly the duties are excessive; and that question is out of the case.

The next question is as to the payment in order to get possession of the goods. Now, the law in force at that time required that duties should be paid in cash; and also required that the duties should be paid before the goods were delivered. In the case therefore of all these entries where the original amount of duty paid was computed at the rate of 24 per cent., and where it appears that, as matter of fact, the duty was paid before the goods were delivered, it must be assumed that the duty was paid to obtain possession of the goods. The law requires that the duty should be paid first. The law forbade the delivery of the goods without payment of the duty. If the duty were in fact paid before the goods were delivered, it is a proper assumption that it was paid to obtain possession of the goods. With regard to those cases where there were amended entries, where, subsequent to the first payment, there has been an increase of duty, and the increased amount paid, it appears in each case, except in those which have been disclaimed, that the duty was in fact paid before the packages which were sent to the appraiser's stores for examination were delivered. The condition there was this. The law required that duties should be paid before the goods were delivered. The goods which had been delivered to the merchant prior to the examination and increase of duty, were delivered under the 10-day bond, which obligated the importer, (as I understand its form, and I think one is in evidence; if not, the form appears from the regulations,) to return the goods upon call, if that call was made within 10 days. In view of that fact I am clearly of the opinion that the duties which were paid before the delivery of the last packages of goods were paid to obtain possession of the goods within the meaning of the statute.

The only question then left is as to the protest; that is, as to its form, as to its service (meaning the method of service) and as to the time of service. As to the form of these printed protests, and notably of the first so-called prospective protest No. 6, where one protest is pasted to another, with the signature at the foot of the composite document thus constructed, I am of the opinion that in view of the decisions as to the rules which should be applied in the construction of these protests, which are prepared by business men,. and in the hurry of business, that the protest is sufficient; that the prospective clause covers everything that

is in it from the beginning to the end; and that, therefore, so far as mere form is concerned, the first prospective protest put in will cover all the subsequent importations. On the question of form, there only remain the first five of these protests. I think that Nos. 1, 2, and 5 are sufficient in form, in view of the decisions which have been cited on the argument, because they indicate to what particular part of the tariff act the importer appealed for a rectification of the amount of duties exacted from him. As to Nos. 3 and 4, I am not satisfied that they do, with any sufficient degree of clearness, or that they do at all, indicate upon what clause it was that the importer relied as securing him the 19 per cent. duty. It will not do for an importer to say "my goods are subject to the 19 per cent. clause," or the 10 per cent. clause, or are on the free list; but he must indicate in what part of that clause they are designated. He need not do so by an enumeration of the particular section, or by any technical wording; but he must do so, in his protest, in language so plain that there will be no difficulty in finding whereabouts it is that he supposes that the exemption, or the reduction of duty, is provided for. Therefore, as to Nos. 3 and 4, I shall direct a verdict for the defendant, on the ground of the insufficiency of the form of protest.

The next question is as to the service of protest, as to its method of service. The regulations and the statute are alike silent as to who shall be served. That being so, inasmuch as it is a protest against the action of the collector, we may assume that it should be served upon him, or upon such person as might properly take his place for the purpose of service. In the absence of anything controlling, either in the statute or in the regulations, it would be for the collector, within reasonable limits, to determine in what way the protest should be served. Of course it would not be expected that the collector should himself receive all these notices, unless he chose to do so. He might delegate any one to receive them. They might be served upon the collector personally, or they might be served upon such deputy, clerk, or officer in the department as he might have designated to receive them. They might be served by depositing them in such receptacle in the department as he might have designated as the place where they should be put. Where a particular method of serving protests against exactions of duties generally had been in force, and recognized by the department for a considerable time past, it is to be assumed that service made in that way is sufficient until some change, promulgated by authority of the collector, is announced. Now, while there is no official order made by the collector in evidence, still there is evidence here of a custom, method, or usage in which, for a considerable period of time anterior to the date of these transactions, and, as I understand it, anterior to the promulgation of the regulations of 1857, these protests were served; namely, by passing them in with the entry. In the absence of any proof of promulgation by the collector, of an order making some alteration in that method of service, I shall hold that it is a sufficient method, so far as the manner of service is concerned. The regulations which have been put in evidence may, of course, control the collector, but they cannot control the

importer as to the manner in which he shall prepare these notices. For instance, a provision that he shall not write a protest on the entry, or a provision that he shall write it on a separate piece of paper, and not fasten it to the entry, or any regulation of that kind, might be binding upon the collector, and perhaps upon the other officers of the government so as to justify them in refusing to consider the protest, or to make a refund. But, whenever the importer goes into court, if he shows that he served the protest which the statute called for, a written protest signed by himself, setting forth distinctly and specifically the grounds of his objection, and served it on the collector, or on such person as might properly be considered the *alter ego* of the collector for the purpose of receiving the notice, he has complied with all the requirements which the law calls upon him to comply with.

With these views as to the form, and the manner and time of service, there is but little left in this case. The service of the first prospective protest, No. 6, is proved as fully and completely as I suppose it is ever possible, after the lapse of a generation to prove any particular transaction. The proof offered by the plaintiffs furnishes a strong presumptive case in favor of the service of the protest; and the proof from the records of the department that such protest was recorded when received, and stands of record as of a certain date, is abundant to establish the fact that it was served on the collector, or on the proper party authorized to receive it, and that it was served in time. From and after the service of that protest, therefore, all questions as to the form of protest, or as to the manner of service, or as to the date of service, require no further consideration. The doctrine of prospective protest, as laid down in this circuit, is sufficient to cover all the subsequent importations.

Number 5, the entry by the Morning-Star, stands in precisely the same position. That protest is also recorded in the books of the customhouse. The fact of its recording, and that it is recorded there, and that the date of its recording there is sufficient in point of time, is sufficiently established to warrant the holding of the sufficiency of the protest in point of time.

Numbers 3 and 4 are disposed of in the other branch of the case, and there then remain only Nos. 1 and 2. As to these protests I have more doubt upon the question as to whether or not I should send it to the jury to determine whether they were served in time. But, in view of all the evidence in the case, in view of the fact that they come here in writing, on the face of the entry, a method of protest which, under the statute, the importer was entitled to adopt if he chose to do so, and in view of proof of the fact that from the time that the entry goes to the cashier, at or about the time of the payment of duties, it passes out of the custody of the merchant and remains in the custody of the custom-house, except so far as he may from time to time be able to look at it in the presence of the custom-house officers, I have arrived at the conclusion,—in the absence of any evidence except the presumptions, or inferences to be drawn from these protest books, and from the fact that the instrument was not recorded there,—that there is sufficient

proof here which is practically uncontradicted to warrant the court in taking it from the jury, and in drawing the inference that the protests in regard to the entries Nos. 1 and 2 were served in proper time.

I therefore deny the several motions of the defendant, except the one as to Nos. 3 and 4; directing a verdict for the defendant for Nos. 3 and 4, on the grounds stated; and direct a verdict for the plaintiffs as to the others.